May it please the Court. My name is David Hagiagyan, counsel for petitioner Ms. Yunita. The Court has asked the parties to be prepared to address three different questions for today's oral arguments. Can I ask you, at the outset, were you the counsel? At the Immigration Court level. At the, okay. Yes, sir. First, the Court wanted to know the distance between Jakarta and Bekasi. Google Maps shows the shortest driving distance between the city of Bekasi and the city of Jakarta as 12.6 miles. That wasn't presented to the Immigration Court, was it? It was not, Your Honor. Why? Your Honor, the questionings from, actually, Your Honor, that particular question wasn't addressed. However, Ms. Yunita was asked. She said it took two hours. What she was talking about is the traffic conditions in Indonesia. Did she explain that? That's in the transcript. Did she say how far it was? No, we didn't go into kilometers or miles. It didn't give the IJ any graphics? No, Your Honor. It is approximately one mile more than the distance from the city of Pasadena to the city of Los Angeles. However, encompassing both the city of Jakarta and the city of Bekasi is what is known as the Greater Jakarta Area, which is over 390 square miles. Was any of that information provided to the Immigration Judge? It was not, Your Honor. However, it's in this context. When Ms. Yunita was saying that she made a mistake as to the city, where she had corrected herself and said, I live in Bekasi, the judge was saying, well, how is it that you live here and then Jakarta is over two hours away? And she was trying to reiterate to the judge that I used Jakarta only as a reference point because, say, someone who's not familiar with the area may understand it if I were to say that I live in Jakarta, as opposed to I live in Bekasi. Much like, say, if someone who lives in Sherman Oaks or Woodland Hills may say to someone who's not from around this area that I live in the city of Los Angeles. It's a better analogy than the one you invoked of Riverside. Yes, Your Honor, it is. Riverside takes two hours. I know. I tried to drive it. I drove it last Friday. So, you know, and it's a big difference. That was by previous counsel, Judge. But, yes, I think that this analogy hits a little bit closer to home or is more accurate. The second the court wanted to know whether the street address listed on petitioner's asylum application is in the city of Bekasi or Jakarta. Petitioner's address as corrected in her asylum application is in the city of Bekasi. That's right. Again, that wasn't presented to the. Well, it was. That was, Your Honor. If you take a look at page 142 of the administrative record, and I've made a photocopy of that for Your Honors to look at, which is petitioner's asylum application. You will see that although petitioner initially wrote down her address as the city of Jakarta, she corrected herself before the asylum officer, before ever getting to court, that the city she lived in is actually Bekasi. And you will see its number designated as 8 on the top of the page. As discussed in petitioner's brief to the court, petitioner initially wrote her city as the city of Jakarta for ease of understanding. However, she corrected herself way before the immigration court level, and the immigration judge was concerned only with the fact that petitioner listed Bekasi as her home address but listed Jakarta as her school address. But when you take a close examination of this application, you'll see that whenever petitioner was asked about an address on her application, she corrected it as the city of Bekasi, as indicated by the handwritten notes of the asylum officer. The asylum officer did not specifically ask petitioner about the address of her primary schools. Therefore, those specific addresses remained as Jakarta and were not corrected as the city of Bekasi. And you will notice that there is no checkmark next to her primary schools, affirming the fact that she was not asked the question of where her primary schools were located. This was a point that the immigration judge overlooked. Let me ask this question. When the immigration judge verbally made her findings and found that there was an adverse credibility reason for denying the petition, why weren't all these factors raised immediately, either through some sort of objection or request for supplemental documentation or corroboration? And when those weren't raised, does that somehow waive the argument before us today? And I'm really happy that you asked that, Your Honor, because that was part of the bias that the judge exhibited. Normally, during the immigration court level, the parties have an opportunity to be able to give closing arguments, to be able to flesh out issues such as this one. In fact, Your Honor, if we go back to your question, you said, were any of these raised at the immigration court level? Actually, come to think of it, yes, they were. I had a map with me in the court that I wanted to show the petitioner, and I wanted to refresh her memory where the immigration judge said to me specifically, no, I will not allow you to do that. And I'll find this item before I leave. I will give the site. Coming back to you, Your Honor, the judge went immediately into her oral decision. She didn't afford us an opportunity to flesh out these issues. The only question that was asked from the judge was, okay, counsel, is your client going to take voluntary departure or not? And that was it. And then from that, she went directly into her oral decision. What about the name translation? Yes. Okay, so that was the next question. That I've also provided a copy of on page 220. The immigration judge incorrectly thought that this document describes the birth of Yu Jong Tong Jin and therefore did not believe that petitioner proved that she is ethnically Chinese, as this name is not the same name that was listed on her family card or the proof of citizenship as petitioner's mother. The immigration judge ---- In plain terms, the IJ thought this was a description of your client's mother, birth of her, when in fact it was ---- Sorry, no. She thought that it was her mother's birth of her grandmother, not the reverse. This is her mother's birth certificate. She was born to a person named Yu Jong Tong Jin. And this is where that mistake stems from. If you take a look at the word from on the second sentence in the main body, if that is changed to of, you will see that evidently that the birth of Sui Nijit that was born in Talak Milano on March 14, 1953, a daughter from Yu Jong Tong Jin. So she, the immigration judge, mistakenly believed Yu Jong Tong Jin to be Miss Yunita's mother. And that name didn't match up with all the other names in the documents versus Sui Nijit. Who was the person? I'm sorry? Who was the person? This is, this birth certificate describes Yunita's mother who was born to her grandmother, correct? Right. So the judge just got it in reverse. That would explain the name. Right. The judge just got it in reverse. But you said that the from had to be read as of. Of. Yes. That's the only thing. And that wasn't called to the ID. Like I said, the judge was very hostile. The judge would not give an opportunity. But was that argued to us in the briefs? This is in the briefs. In the. In the mistranslation of from to of. What the previous attorney had argued was that there is a name, excuse me, that there is a spelling change that. Yeah, that was a whole different theory. Right. No, no. That there was a change. It's part of. It's part of, Your Honor. What the previous attorney was arguing that instead of NJ, it should be NY. No, but that's not what you're arguing to us. Right. You're translating the word. Substituting the word. Yeah, substituting. That's correct. Because it's got two, there's either a mistranslation or it could have been, should have been of and it would have been clear. That wasn't the way the case was presented to us. Yes. It was this notion that the language went through a revision and that the name spelling would have been clarified. But that's totally wrong because that's not correcting the judge's mistake. It is and it isn't, Your Honor. Well, we know what it is. If you'd like me to address it, I will. Well, look, the problem is, speaking for myself, my concern is that the evidence we've been talking about seems to directly address the concerns that were raised by the IJ and go to credibility. But I don't see anything in the record, as argued or presented to us, that shows that the IJ was confronted with these. Now, that may be the IJ's fault and it may be because she cut you off, but that's the problem. This information that we're talking about came about because my law clerk did some checking, which is outside the record, and it bothers me that there may have been some errors here. So I'd like to hear from the government to see whether it feels that any of this information makes a difference. It looks like it answers to the major questions that the IJ had, and that would be unfortunate if it doesn't get before the agency, if in fact there is a reasonable chance that somebody would change their minds. So why don't we hear from the government? Thank you. Good afternoon, Your Honors. My name is Arthur Rabin, may it please the Court, on behalf of the Attorney General. We don't even get to that issue, Your Honor, because there is an exhaustion problem. I understand that, Counsel. Let's talk about the equities and the facts of the case. Okay. The facts of the case are these. Ms. Unita was confronted by the immigration judge with the apparent discrepancy. Counsel, I know that. I know. We've all read the record. These documents objectively explain what she and artfully was trying to say, and if the IJ or the agency look at this, would that make a difference in how they evaluate the merits of her case, of her claim? I cannot speak for the agency. Okay. Then can you we have a process here. I understand that there are legal thresholds, and there may be a legal one in the Jen case. I'd like to hear your views on that. But assuming not, let's assume that these documents, if looked at by the agency, would say, okay, now we understand what she was driving at, so to speak, because of the distance issue, and we understand how there may have been a confusion as to whose birth and parentage were being described in this other document. So that clears up that translation problem or that issue. Then would they reexamine the – But there's a second problem, and that is, did she prove that she was indeed of Chinese ethnicity? Well, that's what this one goes to. That's the language one. I mean, that's the translation one, because there's no doubt that there's a statement that there is a Chinese ancestor in the chain here that's being described. It's just that the IJ thought it was the wrong generation being described. I mean, when the IJ confronted her, that was not her explanation. I understand. So, I mean, I can't speak for the agency to say, well, you know, this chain is established because of her ethnicity. Well, you know, there's a lot of things that bother me about this case, too, and we're trying to find an equitable solution. Do you understand that? Of course, Your Honor. Okay. You don't act like you do. We don't – you tell us what we have to do. What do we need to do here? Well, Your Honor, I mean – Help this woman out. I don't think she's had good representation all along. Let me chime in as well. Obviously, I'm not from California, but when I looked at this, my concern was that there probably were some failures to object, failures to present clarifying information to the IJ. But at the end of the day, if that information is now available, so looking at what is the just and proper outcome here, we're concerned that that be a part of today's argument. I think that if Your Honors would like, I can approach the agency and ask them if they're willing to, one, remand, or two, possibly administratively close this case, as has been done in numerous other cases, because of the equities involved. Does that answer Your Honor's question? That does. And let me suggest that we have a mediation process that the immigration – I don't know if you've participated. I've done it. I've done it. Okay. So if you think a mediator would help, we recognize exhaustion and other issues. But what we want to – because if there is objective confirmation here, that would satisfy the agency. That's all we want to have happen. Yes, Your Honor. Given what you said, and we'd be happy to facilitate a mediation. We won't participate in it, as you know, but that would be a way for you all to see if you can work it out. Absolutely, Your Honor. I can, if we put this case in the bands, put it in the mediation program, I can approach the agency, work with the mediator, and counsel is obviously very receptive to that idea, I'm sure, and we can see what we can work out. Okay. All right. That would be good. Okay. We appreciate it. Yes, Your Honor. Where is your – where are you located? I'm sorry, Your Honor? Where are you located? I'm in Washington, D.C., Your Honor. This is the first good thing I've heard coming out of Washington in a long time. Yes, Your Honor. Does the Court need me to address any of the legal issues? Yes, just address Jen.  I mean, Wren. Wren, Your Honor. In Wren, we would submit that that case is distinguishable from the present case, and that is because in Wren there was basically a double analysis made by an immigration judge. He first made an adverse credibility finding, and then when he made that finding, then he also then turned to whether or not the burden was proved as to corroboration. So we submit that in this case, there was no such dual analysis by an immigration judge, and Wren is distinguishable because for purposes of 1158, there are two subclauses, and we submit that our case was decided under the subclause B-3, whereas in Wren it was B-2. What difference does that make? That's because, Your Honor, we would submit that the analysis of Wren does not apply to our case because here the immigration judge said, you know, I either don't believe you or I don't know what to believe because it's so confusing. So I asked for corroboration. I put you on notice that I needed corroboration in this case. You said you didn't need time to produce it.  So we believe that Wren, which is now, you know, there isn't a shoddy case. We cite it in our supplemental brief in the back that's about to go up. It's subject to this Court's review en banc. So we would submit that that question. I'm just trying to understand. The I.J. here made an adverse credibility finding. Okay. And gave, at that point, time to go seek corroboration? No. Well, before the case even started, she said, do you have a- At the beginning. At the beginning. But she didn't know what the, you know, they didn't know what the issues were at that point, right? So she's saying, as part of my credibility finding, I'm seeking corroboration. Yes. And? Not alternatively. Not like in Wren, where she said, well, I am making an adverse credibility finding. Now, what do you have to corroborate? Which is two different subsections of the statute. Okay. Look, if we're in an- I just want to understand the government's position. The I.J. is dissatisfied with the proof that's offered, and says, from what I've heard now, I don't think you- I don't believe you, or I don't know what to believe, and you don't have any corroboration. Okay. So that's the end of her chance to go find corroboration, even though these documents indicate that given time and effective assistance of counsel, they could have come up with, as was done today, explanations for two of them. And you're saying that Wren doesn't cover that. Because in Wren, the immigration judge said, I have an adverse credibility problem with this case. Now, go forth and go find corroboration. Why shouldn't the I.J. do that in this case, have done? Because she had already placed petitioner on notice of corroboration. Only about the need for corroboration, but didn't specify as to what. No, she didn't specify, but she said, you know, this is a real I.D.I. case. Beyond notice of corroboration may be required in this case. Yes, but why is it that- Do you need time? Yeah, but what's the immigrant supposed to go out and come up with before they even know what's bothering the I.J.? Well, it's not necessarily what's bothering her. It's just that if she knows that she put prior inconsistent statements in her application- She didn't. I mean, what's the cause, you know? And she thought that the birth of this information was satisfactory. But it's only upon questioning by the I.J. or you or whomever that pinpoints it. But at that point, she could have said, well, Your Honor, yes, I do have corroborating evidence. I just need time to go get it. Well, counsel represented that that's what he said. No, he represented that he was going to explain all this in his closing argument and or provide a map to her during the hearing, which the I.J. disallowed. Okay, the map and disallowed. So wouldn't that have been corroborated? Yeah, if he would have- Well, I'm not sure what the immigration procedures are in immigration court about giving notice to the government about using a map. Obviously, it was something that was never provided to anybody. He just came up with it on his own out of the blue. And if he would have said that's corroboration- Government could have done that. Opto had done that, frankly. You can do it on your own. This is a big deal. The government, the first place you go when you're looking at geography is you go Google Maps or Thomas Brothers or whatever. Okay, we have your argument. You can see the reasons we would appreciate a closer argument. Yes, Your Honor, and I'm fully- Thank you. Mr. Wyss, thank you very much. Yes, Your Honor. Thank you. We're very, very happy with you. All right. Some nice notes to end on today. And we'll recess until tomorrow morning at 9.15.
judges: Daniel, Pregerson, Fisher